**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GREE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | Case No. 2:19-cv-00070-JRG-RSP |
| v. | § | Case No. 2:19-cv-00071-JRG-RSP |
| | § | |
| SUPERCELL OY, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM ORDER

Before the Court are motions in both cases entitled Motion to Exclude the Testimony of GREE, Inc.'s Damages Expert, Stephen Becker ("Motions"), filed by Defendant Supercell Oy ("Supercell"). **Dkt. No. 198** in Case No. 2:19-cv-00070-JRG-RSP ("the -70 case") and **Dkt. No. 181** in Case No. 2:19-cv-00071-JRG-RSP ("the -71 case"). After consideration, the Court **DENIES** both of Supercell's Motions.

### I. BACKGROUND

Plaintiff GREE, Inc. ("GREE") filed suit against Supercell in the -70 case, asserting four patents—U.S. Patent Nos. 9,604,137 ("the '137 patent"), 9,774,655 ("the '655 patent"), 9,795,873 ("the '873 patent"), and 9,956,481 ("the '481 patent"). Dkt. No. 242-4 at ¶ 1.[1] GREE asserts that Supercell's Clash Royale mobile game infringes claims of the '655, '137, and '481 patents and its Brawl Stars mobile game infringes claims of the '873 patent. *Id*. GREE also asserts that Supercell's Clash of Clans mobile game infringes claims of U.S. Patent No. 9,597,594 ("the '594 patent") in the -71 case. Dkt. No. 204-4 at ¶ 1 in the -71 case. All three games—Clash Royale, Brawl Stars, and Clash of Clans—are free to play, generating revenue through optional in-game purchases.

---

[1] Unless indicated otherwise, all citations are to the record of the -70 case.

The asserted patents claim different functionality; thus, GREE accuses different features in Clash Royale and Brawl Stars. GREE accuses Clash Royale's "card donation" feature of infringing the '655 patent, in which one clan member may donate a card to another, triggering a reward for the recipient. Dkt. No. 242-4 at ¶ 66. GREE accuses Clash Royale's card deployment features—the "Elixir point system" and "hit point system"—of infringing the '137 and '481 patents.[2] *Id*. at ¶¶ 64–65. GREE accuses the "aiming and shooting" feature within Brawl Stars of infringing the '873 patent. *Id*. at ¶ 77. GREE accuses Clash of Clans' "copy layout" feature of infringing the '594 patent, in which one player may view and then choose to apply the template of another player as their own. Dkt. No. 204-4 at ¶¶ 54, 59 in the -71 case. While the "card donation" feature is optional, the rest are features that players use each time the games are played.

Dr. Becker is GREE's damages expert. Dr. Becker opines that the structure of the reasonable royalty in this case is a running royalty expressed as a percentage of gross revenues from each of the accused Supercell games. Dkt. No. 242-4 at ¶ 14-5. He determined the appropriate royalty is a percentage of the gross revenues of Supercell's accused games because Supercell does not track revenue earned from any one feature. To calculate the appropriate royalty, Dr. Becker relies on survey data from GREE's survey expert, Dr. Neal, as well as survey evidence from Supercell in forming his opinions. *Id*. at ¶¶ 127, 130. Dr. Neal surveyed Clash Royale players to measure awareness, importance, and usage of features in the game, including the accused donation feature of the '655 patent. Dr. Becker also relies on opinions from Dr. Akl, GREE's technical expert, to determine the comparability of the various asserted features.[3] *E.g., id*. at ¶ 235.

In the -70 case, Dr. Becker used two methodologies for determining a reasonable royalty for the '655 patent. First, Dr. Becker opined on a 1.99% "starting point" using survey data from

---

[2] The '481 patent is a continuation of the '137 patent.
[3] Supercell only challenges Dr. Becker's opinions in this motion.

Dr. Neal. *Id.* at ¶ 134. To achieve this number, Dr. Becker calculated that removal of the donation feature would reduce playing time by 11.76%. Dr. Becker also calculated that the elasticity of time spent in the game versus revenue for Clash Royale is 0.1690.[4] Combining the two led to a marginal revenue impact of 1.99%. He noted that some players would spend more time playing the game if the asserted feature was removed but deemed this would likely have been unproductive time that would not increase revenues. *Id.* at ¶¶ 135, 218–19. While he calculated that this would result in a marginal revenue impact of 0.83%, he deemed it less useful and did not further use this data point.

Second, Dr. Becker performed a separate calculation using Dr. Neal's survey data to arrive at an "alternative" 8.6% starting rate. *Id.* at ¶ 136. He achieved this number by multiplying the likelihood of being a paying user by the percentage of users that view the patented feature as important. While considering this number as a useful comparative data point, Dr. Becker preferred the 1.99% starting point and used it for the rest of his calculations. *See id.* at ¶ 230.

After further adjustments to his preferred starting point of 1.99% to account for contribution of non-patented features, he calculated that "the parties to the hypothetical negotiation would have agreed to a rate of 1.1%" as the reasonable royalty for the '655 patent.[5] *Id.* at ¶ 233.

For his calculations regarding the '137, '481, and '873 patents, Dr. Becker began his analysis with the 1.99% starting point. *Id.* at ¶ 235. He used the same starting point as the '655 patent based on Dr. Akl's opinion that the "GREE patents asserted in both cases are technologically comparable since they all relate to video game services" by providing "features and elements that enhance the user's experience and thus increase user engagement." Dkt. No. 242-6 at ¶ 4. Dr.

---

[4] Here, elasticity is the relationship between time spent in the game versus revenue and provides a calculation of the percentage change in revenue for each percent change in time spent playing the game.
[5] While the expert report states that this rate was for the '594 patent, Dr. Becker submitted a later Errata correcting his mistake. Dkt. No. 242-16 at ¶ 2.

Becker then adjusted the starting rate to account for features specific to each patent. Dkt. No. 242-4 at ¶¶ 235–39, 241–45.

In the -71 case, Dr. Becker mirrored his analysis of the '655 patent for the '594 patent to arrive at his preferred starting point of 1.27 %. Dkt. No. 204-4 at ¶ 107 in the -71 case. He also calculated two alternative starting rates of 0% and 3.36% using the same processes he had used for the '655 patent in the -70 case. *Id.* at ¶¶ 108–109 in the -71 case.

Supercell takes issue with certain portions of Dr. Becker's expert report and accordingly, seeks to exclude his testimony. Specifically, Supercell raises three arguments. First, it argues that Dr. Becker used unreliable methodologies for his reasonable royalty calculations in arriving at his 1.99% and 8.6% starting points for the '655 patent and 1.27% and 3.36% starting points for the '594 patent. Second, it argues Dr. Becker's opinions regarding the '137, '873, and '481 patents are flawed since he uses the same starting point as he used for the '655 patent—1.99%–even though Supercell contends the other patents are not technologically comparable. Third, it argues Dr. Becker failed to apportion damages to the value attributable to the patented inventions and impermissibly used Supercell's overall product revenues.

## II. LEGAL STANDARD

### a. Expert Witnesses

A qualified expert witness may offer opinion testimony if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. FED. R. EVID. 702.

"[T]he Rules of Evidence—especially Rule 702" require that judges act as gatekeepers to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). However, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Id*. at 594; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'"). While the party offering the expert bears the burden of showing that the testimony is reliable, it "need not prove to the judge that the expert's testimony is correct . . . ." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 1999) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). Ultimately, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014), *overruled in part not relevant here by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

"The reliability prong [of *Daubert*] mandates that expert opinion 'be grounded in the methods and procedures of science and … be more than unsupported speculation or subjective belief.'" *Johnson*, 685 F.3d at 459 (quoting *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (ellipsis in original)). "The relevance prong requires the proponent to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue." *Id*. (quoting *Curtis*, 174 F.3d at 668). But "[i]t is within the purview of a qualified expert to determine which evidence should be afforded significant weight, so long as he applies reliable principles and

methods in making this determination." *Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-cv-33-JRG-RSP, 2016 WL 125503, at *4 (E.D. Tex. Jan. 9, 2016).

Further, experts may rely on other experts for expertise outside their field. *Apple*, 757 F.3d at 1321; *see also TQP Dev., LLC v. 1-800-Flowers.com, Inc.*, No. 2:11-cv-248-JRG, 2015 WL 6694116, at *4 (E.D. Tex. Nov. 3, 2015) ("Dr. Becker was entitled to rely upon Dr. Jaeger's technical analysis when constructing his damages model and presenting it to the jury, and the jury was free to judge the credibility of both experts.").

### b. Damages

Upon a finding of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ." 35 U.S.C. § 284. "A 'reasonable royalty' derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868–69 (Fed. Cir. 2010) (citation omitted). A comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation appears in *Georgia–Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

"A patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018), *cert. denied,* 139 S. Ct. 1265 (2019). The patentee bears the burden of proving damages. *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citations omitted). Thus, the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . ." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Accordingly, royalties must be apportioned between the infringing and non-infringing features of the product. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773

F.3d 1201, 1226 (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *Lucent*, 580 F.3d at 1336–37. If the patentee fails to tie the theory to the facts of the case, the testimony is excluded. *Uniloc USA*, 632 F.3d at 1315.

"[A]pportionment can be addressed in a variety of ways, including 'by careful selection of the royalty base to reflect the value added by the patented feature [or] … by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (brackets and ellipsis in original) (quoting *Ericsson*, 773 F.3d at 1226). Therefore, there is "nothing inherently wrong with using the market value of the entire product [as a royalty base], especially when there is no established market value for the infringing component or feature, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature." *Id*. (quoting *Lucent*, at 1339).

An alternative to the general rule of apportionment is the entire market value. *Power Integrations*, 904 F.3d at 977–78 (citing *VirnetX*, 767 F.3d at 1327). "The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for consumer demand." *Lucent*, 580 F.3d at 1336 (quoting *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986); *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc). Thus, no apportionment is required if the "patented technology drove demand for the entire product." *VirnetX*, 767 F.3d at 1329.

### III. ANALYSIS

Supercell raises three major issues with Dr. Becker's report in the -70 case and raises two of the same issues for his report in the -71 case. However, to the extent that they are persuasive, the issues go to the weight, not admissibility, of the evidence.

### a. Starting Points for '655 patent and '594 patent

Supercell first contends that the methodology Dr. Becker uses to arrive at two of his three starting points for his reasonable royalty calculation for the '655 patent is unreliable in the -70 case. The three starting points that Dr. Becker offered were (1) 1.99%; (2) 0.83%; and (3) 8.6%. Dkt. No. 242-4 at ¶¶ 134–36. Similarly, Supercell contends that the methodology Dr. Becker used to arrive at his two highest starting rates in the -71 case—1.27 % and 3.36%—are flawed for the same reasons. *See* Dkt. No. 204-4 at ¶¶ 107, 109 in the -71 case.

Supercell argues that Dr. Becker improperly cherry-picked data to arrive at his 1.99% starting point. Specifically, Supercell argues that Dr. Becker ignored some of Dr. Neal's survey data that would lead to a lower starting point. Supercell does not take issue with Dr. Neal's data. However, Supercell argues that Dr. Becker's partial adoption of the survey data lacks any reliable basis and is inconsistent. Therefore, Supercell contends that Dr. Becker should be precluded from opining on 1.99% as a starting point for the value of the '655 patent feature. Supercell makes the same argument for the 1.27% starting point for the '594 patent in the -71 case.

GREE responds that Dr. Becker did not ignore the data, but instead analyzed all of it and determined some is less reliable and therefore, worth less weight—a determination that is within an expert's purview. GREE points to deposition statements from Dr. Becker as well as Supercell's own witnesses that increased playing time would not be positive, revenue-generating playing time. *E.g.*, Dkt. No. 242-12 at 84:16–85:4. Therefore, GREE contends that at its core, Supercell's

complaint is not with Dr. Becker's methodology, but the weight he places on the evidence—a disagreement better resolved by the fact finder.

The Court agrees with GREE. Dr. Becker does not opine on unsupported speculation or subjective belief. Instead, he analyzes the data and determines that some of it should be afforded less weight based on the facts of the case. *See* Dkt. No. 242-4 at ¶¶ 214–220. Therefore, this calculation will not be barred since "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are for the jury." *Apple*, 757 F.3d at 1315 (citing *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010)).

Supercell also takes issues with Dr. Becker's alternative 8.6% starting point in the -70 case and alternative 3.36% starting point in the -71 case. Dr. Becker achieved these rates by multiplying the likelihood of being a paying user with the percentage of users viewing a feature as important. Supercell argues neither factor is meaningfully tied to gross revenues and the rates lack any tie to the value of the patented feature. It argues that Dr. Becker concedes this by not using these starting points in his ultimate royalty calculation.

GREE responds that Dr. Becker explained how he arrived at these numbers using Dr. Neal's unchallenged regression analysis. Dkt. No. 242 (citing Dkt. No. 242-4 at ¶ 136; Dkt. No. 242-9 at 20–21). GREE further adds that the numbers should not be excluded just because Dr. Becker ultimately determined that the more conservative numbers of 1.99% and 1.27% were more appropriate in view of all the evidence in the respective cases.

The Court finds that this disagreement goes to the weight of the evidence. Dr. Becker provided a basis for arriving at these numbers. His analysis was based on uncontested data specific to each case. If Supercell believes the alternative starting points are shaky evidence, it may use the traditional and appropriate means of attacking it—vigorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof. *See Daubert*, 509 U.S. at 596. However, the fact finder will ultimately decide whether to credit it or not.

Accordingly, Supercell's request to strike Dr. Becker's opinions regarding the 1.99% and 8.9% starting points for the royalty rate of the '655 patent in the -70 case and the 1.27% and 3.36% starting points for the '594 patent in the -71 case is denied.

### b. Other Patents[6]

Supercell next takes issue with Dr. Becker's use of the 1.99% starting point for the '137, '481, and '873 patents. Supercell argues that Dr. Becker failed to perform any analysis of the features claimed in those patents even though Supercell contends that the other patents involve different functionality. Instead, it argues that Dr. Becker's attempt to convert his calculations based on survey data about the '655 patent to the other patents is flawed. It states that "[a]lthough Dr. Becker attempted to account for differences in *usage* of the features, this adjustment does nothing to remedy the absence of any valuation of the features themselves. Dkt. No. 198 at 8–9 (citing *Uniloc USA*, 632 F.3d at 1320 ("Beginning from a fundamentally flawed premise" results in a "fundamentally flawed conclusion.")). Supercell argues that while Dr. Becker relied on Dr. Akl, who found the patents technologically comparable, Dr. Akl's report is conclusory. Therefore, it argues that Dr. Becker's adoption of the '655 patent royalty rate for the other patents should fail because "alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).

GREE responds that Dr. Becker considered the evidence, consulted with GREE's technical and survey experts, and analyzed each feature independently to arrive at appropriate royalty rates for the '137, '481, and '873 patents. *See* Dkt. No. 242-4 at ¶ 5. It points out that Dr. Becker relied

---

[6] This argument was only raised in the -70 case as opposed to the two others, which were raised in both cases.

on GREE's technical expert, Dr. Akl, who opined that the '655 patent was technically comparable to the other patents. Dkt. No. 242-4. at ¶¶ 235, 241. Dr. Becker then made adjustments to account for the difference in the accused features. *See id*. at ¶¶ 234–45. Thus, it argues that Supercell's complaint is not a methodology challenge, but rather an attack on the evidence, and particularly an inappropriate effort to dismiss Dr. Becker's reliance on Dr. Akl's opinion that the patents are technically comparable. But, GREE argues, challenges to "[t]he degree of comparability" between two licenses "as well as any failure on the part of [an expert] to control for certain variables are factual issues best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012 (citing *i4i*, 598 F.3d at 854)). Finally, GREE points out that Supercell did not seek to challenge Dr. Akl's opinions on comparability under *Daubert*.

The Court finds that Dr. Becker's testimony concerning this issue rests on a sufficiently reliable foundation if it is assumed that the asserted patents are all technologically comparable. Dr. Becker is not a technical expert. Therefore, it was proper as well as logical that he would rely on Dr. Akl, a technical expert, who concluded that the patents are technologically comparable. As GREE pointed out, it is perfectly acceptable for experts to rely on other experts. *Apple*, 757 F.3d at 1321 ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field."); *see also TQP Dev.*, 2015 WL 6694116, at *4. Furthermore, Dr. Akl's testimony is not at issue in this motion. Therefore, this portion of Supercell's motion fails because Dr. Becker reasonably relied on another expert's opinions for comparability of the patents— opinions that are not at issue in this motion—and conducted a reliable analysis based on those opinions.

Accordingly, Supercell's request that Dr. Becker's opinions regarding the royalty rates of the '137 patent, the '481 patent, and the '873 patent be stricken is denied.

### c. Apportionment

Supercell finally takes issue with the fact that GREE uses Supercell's gross revenues for its royalty base. Supercell argues that this constitutes a failure to apportion in violation of the entire market value rule as well as an improper reference that violates the Federal Circuit's "evidentiary principle" regarding damages.

### i. Entire Market Value Rule

Supercell first argues that Dr. Becker used Supercell's total revenues (*i.e.*, the entire market value) of the accused games as his royalty base. After collecting Supercell's entire revenues as the royalty base, Dr. Becker multiplied the total revenue by a percentage purporting to represent the "value" of a feature of the '655 patent. He performed a similar analysis for the '594 patent in the -71 case. Supercell contends that the entire market value rule only "allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for consumer demand." *Lucent*, 580 F.3d at 1336 (citation omitted). Yet, Dr. Becker admits that the accused features do not drive customer demand and are just a few "out of many elements of the game that contribute to its success." Dkt. No. 242-4 at ¶¶ 197, 229. In line with this reasoning, Supercell contends that the Federal Circuit has rejected the assertion that apportioning just the royalty rate, as opposed to the royalty base, is allowed. Dkt. No. 198 at 14 (citing *Uniloc USA*, 632 F.3d at 1320; *VirnetX*, 767 F.3d at 1327–29). Supercell therefore argues that Dr. Becker's use of the Supercell's total revenues as his royalty base is a failure to apportion the royalty base in violation of the entire market value rule.

GREE responds that the royalty rate was apportioned to separate the contribution of the '655 patent from the contributions of the non-patented elements of Clash Royale with a similar analysis occurring for the other patents as well. Dkt. No. 242-4 at ¶ 197. It contends that starting an apportionment analysis with revenue or profit does not violate the entire market value rule. Dkt. No. 242 at 14 (citing *Exmark Mfg.*, 879 F.3d at 1349; *Lucent*, 530 F.3d at 1325). GREE explains that the only revenue data Supercell maintains is based on its gross revenues for all money spent by users on its games. Supercell does not track revenue of the accused features, does not have any prior comparable licenses, and does not have any valid non-infringing alternatives. Therefore, GREE has no other revenue data from which a royalty base can be determined. It also argues that Supercell does not provide an alternative method Dr. Becker should have or could have used.

The Court agrees with GREE. Dr. Becker conducted an apportionment analysis. This alone makes the entire market value exception inapplicable as it is an alternative to apportionment. Essentially, the entire market value rule holds that no apportionment is needed since "the feature patented constitutes the basis for consumer demand." *Lucent*, 580 F.3d at 1336. If this demanding showing is made, the patentee can request the entire market value of the infringing product. Dr. Becker does not suggest this—instead he simply begins with the gross revenues of Supercell's products and apportions from them. As described above, Dr. Becker's preferred royalty rates pass muster as Dr. Becker took care to apportion his rates so they would only include the infringing features of the allegedly infringing products. Therefore, Dr. Becker performed a sufficient apportionment analysis even if his royalty base was Supercell's gross revenues. This is especially true since there are no established market values for the allegedly infringing features or, at the very least, Supercell has not provided these values to GREE or the Court.

As to Supercell's argument that the royalty base must be apportioned, the Federal Circuit has stated that apportionment can be addressed in a variety of ways, including "by careful selection of the royalty base to reflect the value added by the patented feature [or] . . . by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Exmark Mfg.*, 879 F.3d at 1348 (quoting *Ericsson*, 773 F.3d at 1226). Thus, "[t]here is nothing inherently wrong with using the market value of the entire product [as a royalty base], especially when there is no established market value for the infringing component or feature, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature." *Id.* (quoting *Lucent*, at 1339). As the reproduced quotations make clear, the Federal Circuit allows a high royalty base when, as here, it is combined with a royalty rate that takes the high base into account and the facts do not reasonably present other alternatives.

### d. Use of Gross Revenues

Lastly, Supercell argues that Dr. Becker's reference to Supercell's overall product revenues should also be excluded because it violates the Federal Circuit's "evidentiary principle" regarding damages. Dkt. No. 198 at 14 (citing *Ericsson*, 773 F.3d at 1226–27). It argues that Dr. Becker's reliance on the entire market value of Supercell's games lacks any correlation to the value of the features that are claimed in GREE's patents, citing Federal Circuit cases that purportedly hold that a patentee cannot offer a large number to the jury in order to make their damage request seem more reasonable. *Id.* at 15 (citing *Ericsson*, 773 F.3d at 1226–27; *LaserDynamics*, 694 F.3d at 68; *Uniloc*, 632 F.3d at 1320; *VirnetX*, 767 F.3d at 1327–28).

GREE responds that, as an initial matter, the issue of whether testimony about Supercell's total product revenues should be excluded is not a proper *Daubert* objection. It further argues that Dr. Becker's conclusions as to the correct reasonable royalty rates in this case are based on the

incremental value each accused feature adds to Supercell's games in accordance with Federal Circuit case law. Dkt. No. 242 at 15 (citing *Ericsson*, 773 F.3d at 1226).

The Court finds that Dr. Becker's use of Supercell's gross revenues is appropriate. As mentioned above, GREE has no other revenue data from which a royalty base can be determined nor does Supercell provide Dr. Becker an alternative method he could use. Essentially, Supercell is asking the Court to prevent GREE from putting on a damages case. The Court declines the invitation. This is not a situation where GREE chose an inappropriately large number to skew the damages horizon and make its damage request seem more reasonable. Instead, the gross revenues data is the best available data, making GREE's use of it appropriate.

Accordingly, Supercell's request to strike Dr. Becker's opinions regarding Supercell's gross revenues due to his purported failure to apportion damages to the value attributable to the patented inventions is denied.

### IV. CONCLUSION

After consideration, the Court **DENIES** Supercell's Motions. Dkt. No. 198 in the -70 case and Dkt. No. 181 in the -71 case.

**SIGNED this 20th day of July, 2020.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE